## WATERMAN *et al. v.* SMITH.

On the 21st January, 1842, the Mexican Government granted to the Indian Chief, Francisco Solano, a tract of land called Suisun, covering four square leagues, within exterior limits, embracing about eight leagues. On the 4th of March, 1840, the same government granted to Armijo a tract of land called Tolenas, covering three leagues, within exterior limits embracing from twelve to twenty leagues. The maps referred to in both grants cover the land in controversy. Upon final confirmation and survey a patent was issued, January, 18th, 1857, by the United States to Ritchie, successor in interest to Solano, for four leagues of land, with the specific description of the official survey by the United States. This patent covers the land in dispute. The grant to Armijo, from whom defendant traced title, was confirmed by the United States District Court, and stands on appeal to the Supreme Court. Assuming that Armijo occupied and claimed, from the entire quantity comprehended within the map referred to in his grant, three specific leagues covering the land in controversy. *Held:* that the patent is conclusive against the defendant, unless he shows title superior to the patent, under a confirmed Spanish or Mexican grant located under those governments, or under the government of the United States.

*Held:* that the grants to Solano and Armijo passed a present and immediate interest in the quantity of land specifically designated in their respective grants, to be afterwards surveyed and laid off within the exterior limits of the general tracts by the government; that such survey could only be made under the former government by its officers and could not be made by the grantees themselves; that the right of survey passed, with other public rights, to the government of the United States, and is to be exercised in pursuance of its policy, and in conformity with its laws; that by its legislation the subject of surveys is intrusted to the Executive Department; that the location of confirmed grants when the quantity granted is without specific boundaries, lying within a larger tract, rests exclusively with such department, and cannot be reviewed or corrected by the judiciary, but is binding and conclusive upon it in actions of ejectment, except only when the patent issued thereon conflicts with prior rights of third parties, and then in its conclusiveness is maintained, only so far as may be necessary for the protection of such prior rights.

Occupation and cultivation can have no greater effect than a private survey. They were without binding effect upon the Mexican Government, and are equally inoperative under the new.

The location of the specific quantity may be made by a survey of such quantity, or by grants with specific boundaries of such parts of the general tract as will reduce it to such specific quantity. Either course will give precision to the claim of the grantee. So long as there remains within the general tract sufficient land to satisfy the quantity specified in his grant, the grantee is without remedy.

Where the dividing line between the two grants was fixed by an award between the parties, the award was conclusive until the action of the government. But the government having issued a patent to Ritchie of a portion of the land included in the general tract designated in the grant to Armijo, it does not lie in the mouth of the latter to complain, there still remaining of such general tract more than sufficient to satisfy the specific quantity granted to him. If the patentee accepted the land described in his patent as answering his claim, other persons cannot complain, even if a portion of the land thus taken was without the boundaries of his original claim.

The limitation of quantity was a controlling condition of the grants in question, and the delivery of juridical possession was an essential ceremony, under the government of Mexico, to perfect the title of the grantees to the specific quantity designated.

The essential and substantive acts under the law of 1851, are the confirmation and survey. The patent is only evidence of the pre-existing title made perfect by these acts. Upon the original grant, final confirmation and approved survey, the plaintiffs might have relied, without reference to the patent.

The title of the parties claiming under Solano became perfect from the time of the approved survey by the United States. On the other hand, the title under the grant to Armijo did not attach to any three specific leagues; it constituted only an interest in such quantity, to be afterwards laid off by competent authority.

Waterman *v.* Smith.

Such general interest cannot be set up as a defense to the claim of plaintiffs. The patent is conclusive evidence of the right of the patentee to the land described therein—not only as between himself and the United States, but as between himself and a third person, who has not a superior title from a source of paramount proprietorship.

The survey having been made in July, 1855, Ritchie having died in July, 1856, the patent, dated January, 1857, is to be regarded as if it had received the signature of the President at the completion of the segregation of the land.

The Act of Congress, (May 20th, 1836,) vesting the title of public lands, patented to a person, dead at the date of the patent, in " the heirs, devisees, or assigns of the deceased patentee," was intended to cover all cases where any rights belonging to the United States existed in lands which could be relinquished by patent, even though the lands were not strictly public lands.

The third persons against whose interests by the 15th Section of the Act of 1851, the final confirmation and patent are not conclusive, are those whose title is at the time such as to enable them to resist successfully, any action of the government in respect to it. Parties holding claims which may be located without the boundaries of the patent, and still within the limits of the general tract designated in the grants to them, do not constitute such third persons, nor do parties who hold claims only upon the bounty of the government, nor do intruders, nor even settlers, having certificates of sale, unless the same ante-date the presentation of the claim of the patentee to the Board of Land Commissioners for California, to which period the patent takes effect by relation. The interests of the third persons, intended by the act, would have been as effectually protected without its provisions, as they are now by them. The section in question is only a legislative recognition of a principle of law and justice, applicable to all grants.

The fact that a grant was not approved by the Departmental Assembly does not impair the title.

Such approval simply discharges the grant from liability to defeasance by the Mexican Government, except for breach of its conditions subsequent.

No law authorizes a forfeiture of any rights of property, under a Mexican grant, for any act or omission on the part of the grantee since the treaty of Guadalupe Hidalgo.

The grant to Armijo, being of three leagues within a much larger area, and no survey having been made, gave him no title to any specific three leagues of land, which would enable him to defend against ejectment on a patent.

APPEAL from the Seventh District.

The Appellants, plaintiffs below, brought an action of ejectment against Respondent, as defendant, for a parcel of land lying in the county of Solano. The title relied on by the plaintiffs, and with which they connected themselves, may be found in the case of *The United States* v. *Ritchie*, 17 How. S. C. 534—537, fully set forth. The chain of title commences with a petition of Francisco Solano to the Commandant-General, M. G. Vallejo, who was the Director of Colonization, for a grant " of the land of the Suisun, together with its known appurtenances."

The following is a copy of the petition :

" *To the Commandant-General :*

Francisco Solano, principal chief of the unconverted Indians, and born Captain of the 'Suisun,' in due form before your Honor, represents : That, being a free man, and owning a sufficient number of cattle and horses to establish a rancho, he solicits from the

strict justice and goodness of your Honor, that you be pleased to grant him the land of the 'Suisun,' with its known appurtenances, which are a little more or less than four square leagues from the 'Portzuela to the Salina de Sacha.' Said land belongs to him by hereditary right from his ancestors, and he is actually in possession of it; but he wishes to revalidate his rights in accordance with the existing laws of our Republic and of the Colonization recently decreed by the Supreme Government.

He therefore prays that your Honor be pleased to grant him the land which he asks for, and procure for him from the proper sources the titles which may be necessary for his security, and that you will also admit this on common paper, there being none of the corresponding stamp in this place.

(Signed)        FRANCISCO SOLANO.

SONOMA, January 16, 1837."

Upon this petition the following order is made :

"SONOMA, January 18, 1837.

The undersigned grants, temporarily and provisionally, to Francisco Solano, Chief of the tribes of this frontier and Captain of the 'Suisun,' the lands of that name, as belonging to him by natural right and actual possession. Said land is comprehended between the 'Portzuela and the Salina de Sacha.' The party interested will ask from the governmental of the State the usual titles, in order to make valid his rights in conformity with the new order of Colonization.

(Signed)        M. G. VALLEJO."

On the 15th of January, 1842, Solano presented a petition to Governor Alvarado for a full grant of the same land, accompanying it with the petition above referred to, to the Director of Colonization, and the marginal decree made by that officer, stating in his petition to the Governor that he is in actual possession of the land known by the name of "Suisun," together with its dependencies, and asking for a perpetual grant of the same. That petition is as follows :

"[SEAL.]

*To His Excellency, the Governor :*

The undersigned a resident of Sonoma, respectfully appears

before your Excellency, and representation makes, that in virtue of the rights which belong to him, as shown in the annexed petition and marginal decree, he is in actual possession of the land known by the name of 'Suisun,' together with its dependencies; and, in order to secure and legalize said ownership, he humbly petitions that your Excellency, in consideration of the document referred to, may be pleased to grant him the corresponding title of concession, perpetual and hereditary, of the aforesaid land in order that in no time may the petitioner or his heirs be molested in the pacific enjoyment of his property.

Wherefore, your petitioner prays that your Excellency will deign to grant him the favor which he asks for, he swearing that he is actuated by no malice, and such other oath as is required, etc. etc.

As Attorney of the petitioner,

(Signed)                          JUAN ANTONIO VALLEJO.

MONTEREY, January 15, 1852."

On this petition the Governor makes the following order :

"MONTEREY, January 20, 1842.

In consideration of the petition at the beginning of this *expediente*, the report of the Commandant-General, and the merits and services of the Indian called Francisco Solano, rendered on the frontier of Sonoma, I declare him to be owner in fee of the place called 'Suisun,' in extent four square leagues, and with the boundaries shown in the corresponding map. The corresponding patent will be made out, and this *expediente* directed to the most excellent Departmental Junta for its approbation.

Juan B. Alvarado, Constitutional Governor of the Department of the Californias, thus ordered, decreed, and signed, of which I certify."

On the 21st of January, 1842, the title in form was granted him, and on the 3d of October, 1845, the grant was approved by the Departmental Assembly, upon the report of a committee made on the *expediente*, "formed at the instance of the Indian, Francisco Solano," as follows :

" [SEAL.]

*Juan B. Alvarado, Const'l Governor of the Dept. of the Californias:*

Whereas, the aboriginal, Francisco Solano, for his own personal benefit and that of his family, has asked for the land known by the name of 'Suisun,' of which place he is a native, and chief of the tribes of the frontier of Sonoma, and being worthy of reward for the quietness which he caused to be maintained by that unchristianized people; the proper proceedings and examinations having previously been made, as required by the laws and regulations; using the powers conferred on me in the name of the Mexican nation, I have granted to him the above-mentioned land, adjudicating to him the ownership of it. By these presents, being subject to the approbation of the most excellent Departmental Junta, and to the following conditions, to-wit:

1. That he may inclose it, without prejudice to the crossings, roads, and servitudes, and enjoy it freely and exclusively, making such use and cultivation of it as he may see fit; but within one year he shall build a house, and it shall be inhabited.

2. He shall ask the magistrate of the place to give him juridical possession of it, in virtue of this order, by whom the boundaries shall be marked out; and he shall place in them, besides the landmarks, some fruit or forest trees of some utility.

3. The land herein mentioned is to the extent of four 'sitios de ganado mayor' (four square leagues) with the limits as shown on the map accompanying the respective expediente. The magistrate who gives the possession will have it measured according to ordinance, leaving the excess that may result to the nation, for its convenient uses.

4. If he shall contravene these conditions, he shall lose his right to the land, and it may be denounced by another.

In consequence, I order that these presents be held firm and valid, that a register be taken of it in the proper book, and that it be given to the party interested, for his voucher and other purposes.

Given this twenty-first day of January, one thousand eight hundred and forty-two, at Monterey.

(Signed)                              JUAN B. ALVARADO.
(Signed)              Manuel Jimeno, Secretary."

" Most Excellent Sir :—

The Committee on Vacant Lands has ordered the expediente, formed at the instance of the Indian, (Indigena,) Francisco Solano, for the place known by the name of 'Suisun,' and being satisfied that the proceedings had in the said expediente were sufficient for the purpose that the Superior Government should have granted the said place, offers to the deliberation of your Excellency the following proposition :—

The grant made by the Supreme Government of the Department by a title legally issued, with the date 28th January, 1842, in favor of the Indian, (Indigena,) Francisco Solano, of the place known by the name of 'Suisun,' and situated in the jurisdiction of Sonoma, in accordance with the law of August 18, 1824, and Article five of the Regulations of November, 1828, is approved.

Hall of the Committee, in the City of Los Angeles, September 29, 1845.

(Signed)        Francisco De La Guerra.
(Signed)        Marceso Bartola."

"Angeles, Oct. 3, 1845.

In session of this day, the proposition of the foregoing report was approved by the most excellent Departmental Assembly ordering the original expediente to be returned to his Excellency the Governor, for suitable purposes.

(Signed)                        Pio Pico,
                                   President.

(Signed)      Agustin Olona, Secretary."

On the same day the proper copy was issued to the party interested.

The Appellants established by several mesne conveyances and other proof, their connection with the above mentioned grant to Solano, through Archibald A. Ritchie, deceased, and likewise offered in evidence a patent of the United States, bearing date the 17th day of January, 1857, issued to said Ritchie, covering the land in controversy. It was likewise in proof that the land sued for was in the county of Solano, and it was admitted that defendant was in possession of the same.

The Respondent pretended to hold under a grant to one José Francisco Armijo, and to connect himself with it by proper mesne conveyances. From these documents, it appears that on the 22d of November, 1839, José Francisco Armijo presented to M. G. Vallejo, the Commandant-General and Director of Colonization, a petition asking for a grant of the place known by the name of Tolenas, which extends from the place so-called to the Ololatos Creek, containing about three leagues of land, more or less, "and joins with the rancho of Suisun." This is the language of the petitioner in the description of the land selected by himself, as appears from the petition which follows:

*Senor Commandant-General:*

José Francisco Armijo, by birth a Mexican, before your Honor, in the manner which may be best for me in the law, say:

"That having four sons, natives of the same country, without owning any lands to cultivate, finding myself owner of about one hundred head of cattle, the product of which I annually lose, supplicate that your Honor will be pleased to concede to me the place known to me by the name of Tolenas, that in company with my son, Antonio Maria, I dedicate myself to the cultivation of my own land and the breeding of cattle, with the understanding that the land which I solicit is from the place already mentioned to Ololotas Creek, containing about three leagues of land, more or less, and it joins with the Suisun Rancho.

For this I pray that you will be pleased to decree as I have petitioned, for which I respectfully forward herewith the map.

This favor I shall perpetuate on my memory.

Does not know how to sign.

SONOMA, Nov. 22d, 1839."

On the same day Vallejo makes an order on the margin of this petition allowing Armijo to occupy the place of Tolenas, "which joins with" (lindra is the word used in response to the language of the petition) "the rancho of Suisun;" enjoining it upon him to take pains not to molest in any manner whatever the Indians who live there or the neighbors; to endeavor to win their confidence, and to give notice of any act of rebellion which

may occur, or any sign of rebellion he may observe, and to communicate in every instance with the Chief of Suisun, with whom, by reason of his being in the immediate neighborhood, it will be convenient to advise whatever may conduce to the lives and tranquility of the settlers.

Here follows the marginal order or decree :

"SONOMA, November 22d, 1839.

The place of Los Tolenas, which joins with the Rancho of Suisun, can be occupied by the interested party, José Francisco Armijo, on account of its being vacant, and not being private property.

The interested party shall also take pains not to molest, in any manner whatever, the Indians who live there nor the neighbors. He shall try to attract the former without violence, inspiring them with confidence. He shall give immediate notice to the military commander of the frontier if any act of rebellion should occur, or should he observe any sign of rebellion among the wild Indians, and he shall communicate in every instance with the Chief of Suisun, to whom, by his being in the immediate neighborhood, it will be convenient to advise whatever may conduce to the lives and tranquility of the settlers.

Apply with this decree to the political authority, that it may serve him as a legal step, and that the grant be made to him, unless there should be some other obstacle to his obtaining the necessary title.

M. G. VALLEJO."

Subsequently, Armijo presented a petition to the Prefect of the First District, asking for a grant of the same land in accordance with the law of colonization. This document is without date. It is as follows :

"[SEAL.]
*Señor Prefect of the First District :*

José Frans°. Armijo, by birth a Mexican, before your Honor, in the manner which may be best for me in the law, say : that having permission from the Commander-General to occupy the land which I indicate in the accompanying petition, solicit the ownership of said land in accordance with the laws of coloniza-

tion, by which, and under its auspices, I believe myself entitled to.

I supplicate that your honor will give the necessary directions to this, my petition, for which I shall always be grateful, swearing it is not through malice and whatever is unnecessary, etc. etc.   I do not know how to sign."

On the 29th February, 1840, the Prefect, Castro, made the following order on this petition :

MONTEREY, 29th February, 1840.

The party interested in this petition having resorted to the prefecture under my charge, let it be carried up to his Excellency, the Governor of the Department, with the corresponding report.                                                            CASTRO."

The prefect accompanies this order with the following report :
*" Most Excellent Señor Governor :*

The prefecture being informed of the petition which José Francisco Armijo makes in claiming the land which he indicates, and of the order of the Señor Commander-General, no obstacle is found to the concession which the government ought to decree, provided the party interested obtains the necessary requisites to be attended to, and that the place which he solicits is found to be entirely vacant.

JOSE CASTRO."

The Governor made a grant to Armijo on the foregoing documents, which grant was offered in evidence by the Respondent in the Court below.   It bears date the 4th of March, 1841.   The land granted is stated to be three leagues, (see 4th condition,) as shown by the map which accompanies the expediente.   The map here referred to, was presented with the petition to the Commandant-General.   This grant contains the conditions usually found in the grants, (see *Fremont's Case,* 17 How. 545 ; *Fossat's Case,* 20 How. 426 ; and *Ritchie's Case,* 17 How.) and the unusual one that " through no motive whatever shall he molest the Indians, who are there located, nor the immediate neighbors with whom he adjoins."

The following is the grant :

Waterman *v.* Smith.

" [SEAL.]

*Juan B. Alvarado, Constitutional Governor of the Department of the Californians:*

As the citizen, José Francisco Armijo, has claimed for his personal benefit and that of his family the land known as Tolenas, adjoining the Suisun Creek, to the estuary of Julpines, to the Ololatos Creek, and to the mountains. The necessary forms and investigations having been previously attended to, according to what is determined by the laws and regulations by virtue of the authority in me vested, I have, in the name of the Mexican nation, ceded to him the mentioned land, by these presents, declaring it his property, subject to the approval of the most excellent Junta Departmental, and on the following conditions:

1st. Through no motive whatever shall he molest the Indians who are there located, nor the immediate neighbors with whom he adjoins:

2d. He can fence it in without damage to the trails, roads, and by-ways; he shall enjoy it freely and exclusively, appropriating it to the use or cultivation which may best suit him, but he shall within one year build a house which shall be inhabited.

3d. He shall request the proper Judge to give him juridical possession by virtue of this dispatch, by whom the boundaries shall be marked out; within which limits, in addition to the landmarks, he shall plant some fruit trees or some useful wild ones.

4th. The land referred to consists of three leagues as shown by the map accompanying the expediente. The Judge who may give possession shall cause it to be measured according to law, the overplus to remain in possession of the nation for such uses as may be convenient.

5th. Should he not comply with these conditions he will lose his right to the land and it may be denounced by another. Therefore, this title being as firm and valid, I order that it be registered in the proper book, and that it be delivered to the party interested for his security and other ends.

Given in Monterey on the fourth of March, eighteen hundred and forty.

JUAN B. ALVARADO.

Notice taken of this dispatch in the Book of Records for the adjudication of vacant lands on the first page succeeding.

His Excellency, the Governor, has ordered that notice of this title be taken in the prefecture of the first District."

The Respondent connected himself with this title through conveyances from José F. Armijo to one D. K. Berry and from Berry to himself.

The grant to Armijo was not authenticated by the signature of the Secretary, nor was it approved by the Departmental Assembly.

It was proven that Solano lived within the bounds of the Suisun Rancho up to the time of his death. He had a rancheria of Indians there of the Suisun tribe. Solano died in 184–. Armijo lived within the map of the rancho of Tolenas until his death, in 1849. Antonio Armijo, his son, resided within the same bounds until his death, in 1850 or 1851. The Armijos did not reside on the same spot within the bounds of the map of Tolenas; he resided first at a spot some two miles south of the Rancheria Tolenas, then removed to a spot one and a half miles east of the first settlement, where he died, which latter spot is in the neighborhood of the *locus in quo*. The Rancheria de Tolenas is near the forks of the creeks coming down from the mountains and forming the Suisun Creek, or about three miles above the dry gulch.

It was established by the evidence of a practical surveyor, Swan, that the deseño of Suisun contains some eight or nine leagues of land, (only four leagues were granted to Solano,) and it was likewise shown by a practical surveyor who had made an estimate of the superficial area, that the deseño of Tolenas contained twenty leagues, of which three were conceded to J. Francisco Armijo. Swan also states that there are in the deseño of Tolenas twelve leagues.

It appears from some documentary testimony offered in the court below by the Respondent, that some time in 1847, or previously, a controversy had arisen between M. G. Vallejo, (who was at that time owner of the rancho of Suisun,) and Armijo the grantee of Tolenas, which resulted in the institution of an action of trespass by Vallejo against Armijo before Alcalde L.

W. Boggs. The Respondent's counsel formally offered this evidence by calling Boggs, to prove that such a transaction took place before him in 1847, and that Prudon, a Frenchman, wrote the award which concludes the controversy. Witnesses were subpenaed, and a summons issued to Armijo, the defendant, returnable on the third Monday in August, 1847. On that day the parties, Vallejo and Armijo, appeared in court, and the court was informed that the parties had agreed to refer the matter to arbitration. The parties selected the arbitrators, who were duly sworn, and an award was presented as their decision of the controversy. It (the award,) was entered on the record as part of the case, and the whole was offered in the court below as one record. It was signed by the arbitrators and the parties, plaintiff and defendant. It was in proof that the award and translation were written by the same person, one Prudon. Here follows the award:

"We, the undersigned, appointed arbitrators by and for Mariano G. Vallejo and Francisco Armijo, to decide on the question existing between them, for having the last trespassed his limits, and usurping part of the land belonging to farm of first; as it is expressed in the complaint presented before the Alcalde of the jurisdiction, L. W. Boggs, and after hearing the declaration of both parties and examination made of the proofs and documents presented to us: we find that the limits of each farm are clearly determined in their respective titles, being those of the Tolenas farm according to the said the Suisun Creek which runs to the N. N. E. of Suisun, and beginning from thence at the first limits mentioned, there are to be measured three leagues running at E. N. E. as the ridge (sierra) runs, leaving the said ridge the natural limits which laying between the two farms, separate them, leaving one at the north and the other at the south. Thus neither of the both parties is prejudicated, and the titual meaning of the respective titles to both farms are fulfilled with, and in order to so not burden one part more than another, the costs of the judgment and those of the tribunal ought to be paid equally by both parties.

And for the fulfillment of the contents of this present writing

we sign it by our hands and seals before the Alcalde of this jurisdiction, on the sixteenth day of August, A. D. 1847.

    (Signed)               CAJETANO JUAREZ,

                            Arbitrator for M. G. Vallejo.

    (Signed)     M. G. VALLEJO.

      (Signed)          SALVADOR VALLEJO,

                            Arbitrator for F$^{co}$. Armijo.

    (Signed)     FRANCISCO ARMIJO."

The counsel for Respondent contended that this award was conclusive of the action in his favor; although he afterwards moved to strike it out, near the conclusion of the case, which motion was denied. The subject matter of this controversy will be understood from the award, which discloses the fact that the action was brought on account of an alleged trespass committed by Armijo on the land of Vallejo. This award was made, as it states, on the proofs and documents presented by the parties—the documents were doubtless the expedientes of the titles of Solano and Armijo. One of the arbitrators testifies that the deseños of both were presented to the arbitrators.

Testimony was likewise offered by Respondent to show that M. G. Vallejo and Ritchie had stated that the *arroyo seco*, or dry gulch, was the line on the north of the Suisun grant, and upon this it was contended by counsel for Respondent, that such admissions fixed the boundary at the dry gulch. The Judge charged the jury in relation to it, but the view taken of the case by the court renders any further statement on this point unnecessary.

There were many minor points as to striking out, admitting and rejecting evidence, which are not presented, because not passed on by the Court. The plaintiffs, however, asked for certain instructions to the jury, which were refused. They may be found in the latter part of the opinion of the Court as the first, third, sixth, seventh, eighth, and ninth, instructions.

The cause was tried before a jury, who, under the charge of the Court, rendered a verdict for defendant, whereupon judgment was entered.

An application being made for a new trial, was denied. Plaintiffs appeal.

*Thornton, Williams & Thornton,* for Appellants.

I.   The Courts of the State should conform their decisions to those of the Supreme Court of the United States, on questions involving the alienation of the public domain, the effect of titles derived from the United States, the interpretation of treaties, and acts of Congress.

This has been the uniform doctrine of the Supreme Court of the United States, and the Courts of the States have followed it.

The ground upon which this doctrine rests is derived from the Constitution of the United States, (see Art. 4, Sec. 3,) which invests Congress with the power "to dispose of and make all needful rules and regulations respecting the territory and other property of the United States." Such has been the uniform ruling of the Supreme Court of the United States in a series of cases. (*Wilcox* v. *Jackson,* 13 Pet. 516, 517; *Bagnell* v. *Broderick,* Id. 450, 451; *Irvine* v. *Marshall,* 2 How. 566, 567; *Pontalba* v. *Copland,* 3 Ann. La. 86—88; *Boyd* v. *Montgomery,* 6 Mo. 514; *Mackay* v. *Dillon,* 7 Id. 10; *United States* v. *Wiggins,* 14 Peters, 350; *Gugnon's Lessee* v. *Astor,* 2 How. 344; *Strother* v. *Lucas,* 12 Peters, 454; *Lobdell* v. *Clark,* 4 Ann. La. 99, 100; *Purvis* v. *Harmanson,* 4 Ann. La. 422; *Foley* v. *Harrison,* 5 Ann. La. 87; *Lott* v. *Prudhomme,* 3 Rob. La. 295, 296; *Hallett* v. *Hunt,* 7 Ala. 882, 900—902; *Ganache* v. *Piquignot,* 16 How. 468; *Gunn* v. *Bates,* 6 Cal. 271.)

II.   The grant to Armijo is in its nature and essence, executory and not executed. It gives to the grantee *jus ad rem,* not *jus in re.* It confers on him the right to three leagues of land, to be afterwards surveyed and laid off to him, within the territory described in the deseño or map by official authority, but the grant did not, nor does it now, attach the title to any particular land. To this extent, there vests in him a present and immediate interest.

This we conceive to be the legal effect and proper construction of such a grant, as clearly defined by the Supreme Court of the United States, in *Fremont's Case,* (17 How. 542, 558, 559.) The grant to Armijo, offered in evidence, is substantially the same as the grant to Alvarado, of which Fremont was the assignee.   (17 How. 545, 546.)   The third and fourth conditions

are identical.  These conditions are common to nearly all the grants made under the colonization laws.  (*Ritchie's Case,* 17 How. 536; *Reading's Case,* 18 How. 2; *Cambuston's Case,* 20 How. 61; *Fossat's Case,* Id. 426; *Fossat's Case,* 20 Id. 426; *Paschal* v. *Perez,* 7 Texas, 367; *Edwards* v. *James,* Id. 379; *Hancock* v. *McKinney,* Id. 449; *Menard* v. *Massey,* 8 How. 305—308, etc.; *United States* v. *King,* 3 Id. 773—786; *Lessieur* v. *Price,* 12 Id. 59; *Stoddard* v. *Chambers,* 2 How. 317; *Barry* v. *Gamble,* 3 Id. 51; *Rutherford* v. *Graves' Heirs,* 2 Wheat. 196; *Neal* v. *E. T. College,* 6 Terger, 190; *West* v. *Cochran,* 17 How. 403, 414—416; *Kissell* v. *St. Louis Public Schools,* 18 Id. 19—25; *Elliott* v. *Peirsol,* 1 Pet. 341; *Cooper* v. *Roberts,* 18 Id. 173; *Gaines* v. *Nicholson,* 9 Id. 304, 305, 356; *Stanford* v. *Taylor,* 18 Id. 409; *Bissell* v. *Penrose,* 8 Id. 317; *Ledoux* v. *Black,* 18 Id. 475; *Willot* v. *Sandford,* 19 Id. 81; *Bryan* v. *Forsyth,* 19 Id. 334; *Ballance* v. *Papin,* Id. 343; *Gilmer* v. *Poindexter,* 10 Id. 257; *Baird* v. *Wolfe,* 4 McLean's C. C. R. 549; *Waddingham* v. *Gamble,* 4 Mo. 465; *Jackson* v. *Van Buren,* 13 Johns. 527, 528; *Vandenburgh* v. *Van Burgen,* 1d. 202; *Corbin* v. *Jackson,* 14 Wend. 625; *Jackson* v. *Livingston,* 7 Wend. 136—141.)

III.  The conditions expressed in the grant to Armijo and Solano are subsequent.  Negligence in respect to the performance of these conditions did not of itself forfeit the right of the grantee.  It subjected the land to be denounced by another; but the conditions do not declare the land forfeited to the State, upon the failure of the grantee to perform them.  (*Ferris* v. *Coover,* 10 Cal. 615; *U. S.* v. *Fremont,* 17 How. 560—562; *Same* v. *Reading,* 18 Id. 1, 6; *U. S.* v. *Cruz Cervantes,* Id. 555; *U. S.* v. *Vaca and Pena,* Id. 557; *U. S.* v. *Larkin,* 558, 563.)

IV.  There was vested in the grantee, under such a grant as Armijo's, a right of possession to the whole land embraced within the limits of the deseño or map, against all the world except the government, or some one claiming under the government.  This right existed until the quantity granted was surveyed off to the grantee by the government, or until the government had made a grant of a specific tract of land to a second grantee within the territory embraced in the map or deseño.  (See *Fremont's Case,* 17 How. 558.)  Unless this were so, unless the grantee had a

lawful possession, the conditions subsequent in the grant could not be performed, and the grantee would lose his land by denouncement. The grantee must enter to perform the conditions, or the grant is *felo de se,* carries on its face its own destruction. It gives no right of value to the grantee, unless he can make a lawful entry, take possession, and defend it. This is sufficient to enable the grantee to maintain the possessory action of ejectment, an action founded on the legal right or title to the possession, and may be maintained though the grantee has not a full and perfect title to the lands.

A case illustrating the point before us in a clear and striking manner is that of *White* v. *St. Guirons,* (1 Minor's Ala. 332—351.) Indeed, the title considered in this case is more clearly similar to the grant to Fremont, as far as this possessory right is concerned, than any other we have been able to find in the progress of our investigations. (1 Wash. C. C. 204—206, and note 2; Id. 160, 425—433; *Payne* v. *Treadwell,* 5 Cal. 311; 3 Chit. Blac. 205, 201, 199; Adams Eject. 12, 9—11, 17, Waterman's Ed. See Argument of Chancellor Bibb, in *Henderson* v. *Tennessee,* 10 How. 317; see, also, Opinion of Lord Mansfield in *Taylor* v. *Horde,* 1 Barrow, 119; Rumington on Eject. 21, 42; *Troublesome* v. *Estill,* 1 Bibb, 128; *Jackson* v. *Buel,* 9 Johns. 299; *Doe* v. *West,* 1 Blackford, 133; *Christy* v. *Scott,* 14 How. 295; *Bullock* v. *Wilson,* 2 Porter, Ala. 437; *Masters* v. *Eastis,* 3 Id. 371; *Goodlet* v. *Smithson,* 5 Id. 245.)

The last three cases cited were imperfect grants under the United States land system. (*Jones* v. *Inge,* 5 Porter, 327; *Fipps* v. *McGehee,* 1d. 432; *City of Cincinnati* v. *White,* 6 Peters, 441, 442; *Ferris* v. *Coover,* 10 Cal. 589.)

V. The Mexican Government reserved the right to survey off the land granted in the case of the grant to Armijo, and of all such grants. This is reserved in the condition in which it is required that the Magistrate who may give possession shall cause the same to be surveyed according to the ordinance, the surplus remaining to the nation for the proper uses. The delivery of judicial possession and survey were executive acts to be performed by the authorities. The obligation to perform these acts now devolves on the United States.

This is the plain meaning of the third condition of the grant

to Solano, 17 How. 536; of the fourth condition in the grant to Alvarado, Id. 546; of the fourth in the grant to Reading, 18 How. 2; of the third in the grant to Larios, 20 Id. 426; and of the fourth in the grant to Armijo. (See cases of Fremont and Fossat above cited.)

VI. The Government of the United States could alienate the land embraced in the deseño of Armijo, where there had been no specific location of the quantity granted to Armijo, as it was held in Fremont's case Mexico could have done. This could be done with the most perfect good faith where a sufficient quantity was left to give Armijo the three leagues granted to him. (*Fremont's Case; Ledoux* v. *Black*, 18 How. 475; *Menard's Heirs* v. *Massey*, 8 How. 301; *Lefebvre* v. *Cameau*, 11 Lou. 203; *Stack* v. *Orillon*, 11 Id. 587; *Lott* v. *Prudhomme*, 3 Rob. 293; *Metoyer* v. *Larenaudiere*, 6 Id. 139; *Cousin* v. *Blanc's Executors*, 19 How. 209; *McCabe* v. *Worthington*, 16 Id. 96.)

VII. The granting and location of lands by surveys pertains to the executive or political department of the government. Until location is given to a grant by survey, where the boundaries are vague and uncertain, the title is imperfect; the title as a title in fee does not become the subject of judicial cognizance until it is perfected by location. (Vattel's Law of Nations, 175; 1 White's Land Law, 601; Act Congress 3d March, 1851; 13 Peters, 450, 516; 20 How. 566; 4 Bacon's Ab. Bouvier's Ed. 1856, Tit. Grant, Sec. 3; *Haven* v. *Cram*, 1 N. Hamp. 93; 2 Bl. Com. 347; *Foster* v. *Neilson*, 2 Pet. 253; Garcia Leo, 12 Id. 511; *United States* v. *Rogers*, 4 How. 127.)

A title or grant is imperfect as a title to any specific piece of land, and as such does not become the subject of judicial cognizance until it is perfected by location. (See *Lessieur* v. *Price*, 12 How. 76; *West* v. *Cochran*, 17 Id. 413; *Kissel* v. *St. Louis Public Schools*, 18 Id. 25; *Stanford* v. *Taylor*, Id. 412; *Willett* v. *Sandford*, 19 Id. 81, 82; *Les Bois* v. *Bramell*, 4 Id. 449; *Bryan* v. *Forsyth*, 19 Id. 335, and authorities cited under point immediately preceding; 18 How. 19, and cases cited under Point VI.)

VIII. In the case of a grant by the Legislature, if the boundaries are not fixed by statute, it must be fixed by survey. Where there is a legislative grant, when a survey is duly made

by the proper authority, no patent is required. Ejectment can be maintained on it without a patent in the Courts of the United States. (*Bryan* v. *Forsyth*, 19 How. 334; 2 Id. 313; 4 Id. 456; 8 Id. 317; *Chouteau* v. *Eckhart*, 2 Id. 372, 373; Remark of McLean, J. 19 Id. 340, 341.)

IX.    The survey must be made by the political department. A private survey is of no authority to segregate the land, or to attach the grant of Armijo to any particular land.

This is and was the rule under the Mexican system, as well as under that of the United States. (Ordenanzas de Tierras and Aguas, by Galvan, Edition of 1855, 226, 227; Story's Eq. Jurisp. 677, etc.; *Smith* v. *United States*, 10 Pet. 327; *U. S.* v. *Hanson*, 16 Id. 199—201; *Acosta's Case*, 17 Id. 19; *U. S.* v. *King*, 3 How. 785; *Jourdan* v. *Barrett*, 4 Id. 169; *Les Bois* v. *Bramell*, Id. 449; Id. 421; *Bissel* v. *Penrose*, 8 Id. 335; *Glenn* v. *U. S.* 13 Id. 256; *Fremont's Case*, 17 Id. 563—565; *American Ins. Co.* v. *Carter*, 1 Peters, 511; *The Fama*, 5 Rob. Adm. Rep. 105; *U. S.* v. *Percheman*, 7 Peters, 86, 87; *Mitchel* v. *The U. S.* 9 Id. 711; *Strother* v. *Lucas*, 12 Id. 410; *Leitersdorfer* v. *Webb*, 20 How. 177.) This last case was in relation to territory acquired under the treaty of Guadalupe Hidalgo. (Vattel, Book 3, Chap. 13, Sec. 200; 1 Kent's Com. 177.)

This being the correct rule, the laws of the United States must regulate the entire system of surveys.

It may be remarked here that there was never in California under the former government such an officer as a Surveyor. Mexico had no such officer here. Though the land system demanded such an official, no one had such powers. The land in fact in the absence of an energetic population capable of developing the immense resources of the country, was of too little value to support a system of surveys.

X.    The United States have made provision for such surveys in the Act of Congress of 3d March, 1851, and the 6th Section of the Act of March, 1831, so far as it is made a part of said Act of 1851. (Dunlop's Laws of the United States, 1296 and 806.)

XI.    The survey and patent of the United States to Ritchie, are conclusive against Armijo and those claiming under him, as the three leagues granted to Armijo have not been located. (*U.*

*S.* v. *Fossat,* 20 How. 414; *Fremont's Case,* 17 Id. 558, 565; *Ferris* v. *Coover,* 10 Cal. 620; cases before cited in 12 How. 76; 19 Id. 335, 336, 343; 2 Id. 344; *Mezes* v. *Green,* before McAllister, J., U. S. Cir. Court for Cal.; *Tobin* v. *Walkinshaw,* Id.; *Pollard's Heirs* v. *Greit,* 8 Ala. 940—942; *Hallett* v. *Hunt,* 7 Ala. 882—900; 4 McLean, 549; *Hickey's Lessee* v. *Stewart,* 3 How. 750; *West* v. *Cochran,* 17 Id. 415; 18 Id. 88; 13 Peters, 451; 4 How, 462.)

XII.  Armijo and those claiming under him are not of the class of third persons mentioned in the 15th Section of the Act of Congress of the 3d of March, 1851, against whom the survey and patent are not conclusive. The third persons mentioned in that section of the Act are those who have titles paramount to the government, and not subordinate to the right of government to enter by its officers and segregate and designate the land which was granted. If this be not true, then Armijo is better off without a survey and patent than with one. (*City of New Orleans* v. *De Armas & Cuculler,* 9 Peters, 224; 10 Peters, 662—731; 5 Wheaton, 290; 9 Cranch, 87; 11 Wheaton, 380; 2 How. 280; *U. S.* v. *Arredondo,* 6 Peters, 738.)

As to perfect and imperfect titles, counsel cited : Blac. Com. Book 2, Chap. 13, p. 195, 199; Ordinenzas above; Escriche's Diccionario de Legislacion, etc. Tit. Propriedad; 8 How. 293, etc.; *Arredondo's Case,* 6 Pet. 691; 13 How. 257; 15 Id. 14, *D'Auterieve's Case; U. S.* v. *Roselius,* 15 How. 31, 33; Id. 38; 10 Id. 442; *Paschal* v. *Perez,* 7 Texas, 367; *Edwards* v. *James,* Id. 379; *Hancock* v. *McKinney,* Id. 449; *U. S.* v. *Davenport,* 15 How. 1, and *U. S.* v. *Patterson,* Id. 10, where the concessions were made by the Commandant at Nacogdoches, who could only make concessions of inchoate grants; to make which perfect the ratification of the civil and military Governor was required. They did not possess this last requisite, and though they had all the rest, wanting this, they were held imperfect. (15 How. 8, 12.) In *Ballance* v. *Papin,* title of plaintiff held imperfect *for want of a survey,* (19 How. 343.) Same title in *Bryan* v. *Forsyth,* where there was a survey held *perfect,* (19 How. 335, 337); and that it was perfected by *a survey,* (337.)

XIII.  The first perfect legal title must prevail. Nothing but a patent will pass a perfect and consummate title, unless in case

of grant of fee by Act of Congress.   The fee is in the government until the patent issues, and this was the view of Congress in enacting the thirteenth section of the Act of the third of March, 1851.

That the first perfect legal title must prevail, see *Stoddard* v. *Chambers*, 2 How. 317, 318; *Ledoux* v. *Black*, 18 Id. 475; *Bagnell* v. *Broderick*, 13 Pet. 450, 451; *Chouteau* v. *Eckhart*, 2 How. 375, 376; *Les Bois* v. *Bramell*, Id. 449; *Mackay* v. *Dillon*, Id. 421; *Barry* v. *Gamble*, 3 Id. 32; *Landes* v. *Brant*, 10 Id. 348; *Menard's Heirs* v. *Massey*, 8 Id. 293; *Bissell* v. *Penrose*, Id. 317; *Mills* v. *Stoddard*, Id. 345.

That nothing but a patent will pass a perfect and consummate title, unless in case of grant of fee by Act of Congress, or grant of a *specific* parcel of land, see *Wilcox* v. *Jackson*, 13 Pet. 576; *Bagnell* v. *Broderick*, Id. 450; *Fossat's Case*, 20 How. 425; 3 Ann. La. 88.

XIV.   A government is never presumed to grant land twice. (*U. S.* v. *Arredondo*, 6 Pet. 738, and authorities there cited; 7 Johns. 8.)   Nor is it to be presumed that any government would by its officers survey the same land to two grantees, especially when she can give the quantity granted to each one of them out of the territory designated in which the land ceded is to be procured.

But it is contended that the treaty of Guadalupe Hidalgo protects the title of Armijo, and to allow the Appellants to succeed upon their patent would be in violation of the rights secured to Armijo and those claiming under him by the said treaty.   This would be true were the title of Armijo perfect, and that title embraced the *locus in quo*.   The treaty did not make the title of Armijo perfect, for like the treaty of 1803, it did not change the character of the claims to land in the territory acquired by it. (See *Chouteau* v. *Eckhart*, 2 How. 375, and cases there cited.) The treaty only protects property; (see Article 8); it does not enlarge or diminish the rights of property.   It guarantees the rights of property as they existed at the date of the treaty, and as they came to the United States.   It does not make the rights attaching to an imperfect title identical with those pertaining to one that is perfect.   Its guaranty goes no further than the law of nations—that law could have afforded the same protection, as

it is recognized among civilized nations. (12 Pet. 436, 438; 7 Id. 88; 6 Id. 741, 742; 9 Id. 133.) While the possessory rights attaching to an imperfect title are protected by the eighth and ninth articles of the treaty of Guadalupe Hidalgo, the same treaty likewise imposes upon the government of the United States a further obligation, *political in its character*, to perfect such imperfect titles; but "this obligation, sacred as it may be in any instance, cannot be enforced by any action of the judicial tribunals." (2 How. 375; 13 Id. 48.) And it would seem that all the legislation of Congress upon this subject has proceeded upon this construction of the treaty, as is manifested by the mode adopted to investigate the claims through a Board of Commissioners, under the Act of 1851. (*Chouteau* v *Eckhart*, 2 How. 375; *U. S.* v. *Wiggin*, 14 Pet. 350.) The judicial tribunals are competent to protect *rights of property*, but not to discharge duties political in their character. Such functions, by our Constitution and laws, devolve upon a co-ordinate department of the government. (*Foster* v. *Neilson*, 2 Pet. 314; *U. S.* v. *Ferreira*, 13 How. 48, 49, etc. etc. cases cited, and note at end. *Sullivan* v. *Davis*, 4 Cal. 291; *Arguello* v. *Edinger*, 10 Id. 150; *Les Bois* v. *Bramell*, 4 How. 462; *Hickey's Lessee* v. *Stewart*, 3 Id. 762; *U. S.* v. *King*, 3 Id. 787; *Ross* v. *Borland*, 1 Pet. 655; *Bagnell* v. *Broderick*, 13 Id. 450, 451; *Wilcox* v. *Jackson*, Id. 517; *Marsh* v. *Brooks*, 8 How. 233; 14 Id. 513; *Barry* v. *Gamble*, 8 Mo. 87; 3 How. 32; 10 Pet. 340; 4 How. 55; *De La Houssaye* v. *Saunders*, 4 Lou. 445; *Broussard* v. *Gonsoulin*, 12 Rob. Lou. 1; *Jewell* v. *Porche*, 2 Lou. Ann. 148; *La Vergnes' Heirs*, 17 La. 230; 2 How. 318; *Burgess* v. *Gray*, 16 Id. 48; *Sterling* v. *Drew*, 5 N. S. Martin's La. 203, 204; *Palmer* v. *Boling*, 8 Cal. 384; *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196; *Gunn* v. *Bates*, 6 Cal. 273; *Landes* v. *Brant*, 10 How. 348; *Strother* v. *Lucas*, 12 Pet. 436; *Stanford* v. *Taylor*, 18 How. 421; *Gonsoulin's Heirs* v. *Brashear*, 5 N. S. La. 33; *New Orleans* v. *De Armas et al.* 9 Pet. 236; *Polk's Lessee* v. *Wendell*, 9 Cr. 99; 5 Wheat. 291; *U. S.* v. *Peralta*, 19 How. 347; *Same* v. *Clark*, 8 Pet. 436; Viner's Abt. Tit. Relation, 290; 2 Cruise on Real Property, 510, 511; 3 Cow. 75; 12 Mo. 145.)

XV. The award or judgment of the Alcalde's Court of So-

noma, dated August 16, 1847, fixes the line running in an east-
erly and westerly direction, dividing the two ranchos of Tolenas
and Suisun by the Sierra Madre, and is conclusive between the
parties.   The construction of this award was a question of law,
and the Court erred in submitting its consideration to the jury.
(*Neilson* v. *Hanford*, 8 Mees. & W. 806, 823; *Hutchinson* v. *Baw-
ker*, 5 Id. 535; *Perth Amboy Man. Co.* v. *Condit*, 1 New Jersey,
659; *Rogers* v. *Colt*, Id. 704; *Brown* v. *Hutton*, 9 Iredell, 319;
*Wason* v. *Rowe*, 16 Verm. 525; *Eaton* v. *Smith*, 20 Pick. 150;
*Hitchins* v. *Groom*, 5 C. B. 515; *Monell* v. *Frith*, 3 M. & W. 402;
*Brown* v. *Osland*, 36 Mo. 376; *Bogg* v. *Forbes*, 30 Eng. Q. & E.
508; *Rupp* v. *Rupp*, 6 Penn. 45; *Brown* v. *Brown*, 8 Metcalf,
576, 577; *Armstrong* v. *Burrows*, 6 Watts, 266; 1 Green. Ev. 378;
*Robertson* v. *French*, 4 East. 135; 2 Parsons on Cont. 13; *Schuyl-
kill Nav. Co.* v. *Moore*, 2 Wheat. 491; *Maillard* v. *Lawrence*, 16
How. 261; 1 Green. Ev. 301; *Roman* v. *Hayward*, 2 Ad. & El.
666; *Crofts* v. *Marshall*, 7 C. & P. 597.)

The Court below erred in refusing the instructions asked.
·(See latter part of opinion.)

*John Currey*, also, for Appellants.

1. The Suisun title for the lands embraced by the survey re-
cited in the patent granted by the United States to Archibald
A. Ritchie was, at the commencement of this action, and now is,
absolute and paramount; and in virtue thereof a verdict and
judgment ought to have been rendered in the case for the plain-
tiffs against the defendant, for the recovery of the land described
in the complaint.

[The Counsel here makes an elaborate argument upon the
doctrine of "relation" to show, that the title of Solano is really
prior in time to that of Armijo.   But it is omitted, because the
Court waive any consideration of that question.]

2. Where. there was a grant by the Mexican nation to one per-
son, of a given number of leagues of land, embraced within a
much larger area described, with a reservation of the excess to
the nation for its convenient uses; and subsequently there was
a grant made by the same authority to another person of a
given number of leagues of land within a larger area described,
with a like reservation, embracing in part land within the entire

area indicated by the first grant, could the junior grantee, or his assigns, either under the laws of Mexico, or of the United States, as successor of Mexico, acquire a title to any of the land within the general descriptions of both grants, paramount to that of the senior grantee?

By the 12th Section of the decree of August 18, 1829, respecting colonization, (Rockwell's Spanish and Mexican Law, 452,) no one person could obtain under that law more than eleven leagues of land; and hence where concessions were made of a definite number of leagues within an area embracing, for convenience of description, a larger territory or district described by prominent or well-defined land marks and water-courses, it became the custom, which was general, if not indispensable, to provide in the concession itself for the segregation, by the officer of the government, of the quantity granted, and that the excess contained within the extended description should remain to the nation, for its convenient uses. And in cases where a specified number of leagues, within a described area of much greater extent, was granted, a segregation of the quantity granted by the officer of the government was of essential necessity, before the grantee could become invested with absolute title to any specific portion of the whole area described. This position follows as an inevitable deduction from the law and the circumstances of the given case, and is equally supported by the opinion of the Court in the case of *Fremont* v. *U. S.* 17 How. 542, 558—560, 565; see, also, *U. S.* v. *Fossat,* 20 Id. 426; *Smith* v. *U. S.* 10 Pet. 334, 335; *Strother* v. *Lucas,* 12 Id. 435, 436, and cases cited; *Lessieur* v. *Price,* 12 Id. 60; Id. 75—77; *Kissell* v. *St. Louis Public Schools,* 18 Id. 21; 17 Id. 413; *Gunn* v. *Bates,* 6 Cal. 272; 13 Peters, 450; Id. 516; 20 How. 566.

All the right acquired by Armijo by the concession of three leagues made to him, was: "The right to so much land, to be afterwards laid off by official authority, in the territory described." Such is the doctrine of the case of *Fremont* v. *The United States,* and such is the principle of law maintained in *Rutherford* v. *Greene's Heirs,* and in *Lessieur* v. *Price.*

There was no evidence that any juridical measurement of any portion of the territory comprehended within the descriptive deseño of the Tolenas, was made or approved under Mexican

authority. As already appears, "under the Mexican Govern-
ment, the survey was to be made or approved by the officer of
the government, and the party was not at liberty to give what
form he pleased to the grant. This precaution was necessary, in
order to prevent the party from giving it such a form, as would
be inconvenient to the adjoining public domain, and impair its
value. The right, which the Mexican Government reserved to
control this survey, passed with all other public rights to the
United States." (17 How. 565; 12 Pet. 435, 436.)

Until such survey and segregation, or laying off, might be
made, it cannot be maintained that the government could not
make a grant to any other person, of any number of leagues not
exceeding the legal maximum quantity, and not exceeding the
surplus reserved by the granting authority for the nation's con-
venient uses. For by the general grant to Armijo, the govern-
ment did not bind itself to make no other grant within the ter-
ritory described, until after he had made his survey. (17 How.
558.) If the rule were declared otherwise, Armijo could hold
the whole domain contained within the exterior limits of his
general grant. He could maintain his action, or defend against
the grantee of the former government, or against the patentee of
the United States Government, for that portion of his domain in
"La parte de Ololate," or at the "Esteros de Julpines," or at
the Sink of the Ololatos, with the same assurance of success, as
at a point nearly at a league's distance below "La Punta de Par-
tida." And that such was the right of Armijo, and those hold-
ing under him, the Court below in effect ruled.

The patent granted by the Government of the United States
to Ritchie, contains therein the survey and map or plat of the
Suisun Rancho, made and approved by the Surveyor-General of
the United States, for California, in July 1855, under, and in
pursuance of the Act of Congress, of March 3d, 1851, entitled
"An Act to ascertain and settle Private "Land Claims in Cali-
fornia." (4 Stat. at Large, 632.) By this survey and allotment
of four specific square leagues of land of the Suisun, as the segre-
gated land, to which the title granted to Solano attached, the
right which the Mexican Government reserved to itself to con-
trol the survey and selection, and which with other public
rights, passed to the United States, has been exercised; and by

such survey and allotment the United States Government has performed the obligation which was concomitant of the right acquired to control such survey and segregation, (12 Pet. 435, 436); and thereby the Suisun grant has become completed and perfected by specific boundaries, (17 How. 558); and cannot be impaired by any subsequent survey that may be made of the three leagues granted to Armijo. This view, it is believed, is fully supported by the decision in *Fremont's Case*, (17 How. 558,) and forever puts at rest the question of title, as to the lands comprehended by the survey and segregation made under government authority, of the Rancho of Suisun. (See, also, *West* v. *Cochran*, 17 How. 408.)

III. The right of the plaintiffs to the possession of the land described in the patent to Ritchie cannot be lawfully resisted in this action.

1. The delivery of juridical possession by an officer of the government was an essential ceremony to perfect the title, as to a definite portion of land under the land system of Mexico, (17 How. 558, and 20 Id. 426); and where such office has not been performed by Mexican authority, the government of the United States, in virtue of its right and duty, will fulfill this obligation to the grantee, who, under the Act of Congress of 1851, may become entitled to its performance. (17 How. 565; 20 Id. 427.)

This duty, as to the Suisun grant, has been performed by competent authority, under our own government. The essential ceremony of perfecting the grant made to Solano, by attaching the title to four particular leagues of land, described by specific boundaries has been completed; and not only are the government and the grantee of the Suisun bound by such selection and segregation, but the grantee of the Tolenas is also concluded thereby. (9 Stat. at Large, 632, Sec. 13; 4 Id. 494, Sec. 6; 17 How. 558, 565; 20 Id. 426; *Reading's Case*, 18 Id. 13; *U. S.* v. *Larkin*, Id. 561; 17 Id. 413; 19 Id. 80; 18 Id. 412; Id. 25; 4 Id. 456, 460, 461.)

2. The patent itself, with the evidence of the conveyance by Ritchie to Waterman, and the conveyance by Waterman to Bissell, is conclusive of the plaintiff's right to the possession of the land in controversy. The patent in the hands of the patentee,

is competent evidence of his right to the land therein described, not only as between himself and the United States, but as between himself and any third person or stranger, who fails to establish a superior title in himself from a source of paramount proprietorship. And this is so because the political sovereign authority of the government has ordained the means which, exercised by the judicial and executive power of the government, works out a solemn official instrument, as a muniment of title, importing absolute verity, and which is primary evidence of what it contains. (9 Statutes at Large, 632, Sec. 13; 4 Id. 494, Sec. 6.)

In *Doe* v. *Eslava*, (9 How. 447,) it was held that a confirmation by Act of Congress was equivalent to a patent—that after such a confirmation, no patent was necessary to confer a perfect legal title. (*Sims* v. *Irvine*, 3 Dallas, 456, 457.)

Thus, it appears, the confirmation and survey under the Act of March 3, 1851, make perfect titles before then imperfect, and vest in the confirmee an absolute legal estate in the land selected and set apart by government authority; and though a patent may issue, it is merely evidence of title made perfect under the Act of Congress. The title vests without the aid of a patent. The government is concluded by the confirmation and segregation, because Congress has so ordained. (9 Stat. at Large, 632, Secs. 13, 15; see, also, *West* v. *Cochran*, 17 How. 412—416; *Kissell* v. *St. Louis Public Schools*, 18 Id. 24—26; *Bryan* v. *Forsyth*, 19 Id. 337; *Les Bois* v. *Bramell*, 4 Id. 460—464; *Landes* v. *Brant*, 10 Id. 371—373; *Lessieur* v. *Price*, 12 Id. 75—77.)

That the patent, when issued, is competent and conclusive evidence of title to the particular land confirmed and surveyed by authority of the government; and from the time of confirmation and official designation, operates by relation, as from the time of official confirmation and survey, seems fully sustained by many of the authorities already cited, and particularly so by the cases of Fremont, and Fossat, and *Stark* v. *Barnes*, 4 Cal. 412; *Jackson* v. *Bull*, 1 John. Ca. 81; *Heath* v. *Ross*, 12 John. 140; *Jackson* v. *Ramsey*, 3 Cow. 79; and *Landes* v. *Brant*, 10 How. 372, 373—which last case contains a clear and cogent exposition of the law of the subject matter under immediate consideration;

the circumstances of which are strikingly analogous to the principal features of the case at bar.

If the grounds here taken are tenable, how stands the objection interposed on behalf of defendant, to the effect—

That the patent issued to Archibald A. Ritchie, after his death, is void, and therefore incompetent as evidence?

It appears, by the record, that Archibald A. Ritchie died July 9, 1856. The survey following final confirmation of the validity of his claim to the extent of four square leagues of land of the "Suisun," was made and finally authenticated by the proper Surveyor-General, in July, 1855. The patent bears date January 17, 1857.

The Appellants insist, that, by a just application of the doctrine of relation, the patent is to be regarded in law, as if it had passed the great seal at the moment the official selection and measurement of the designated four square leagues of land were completed; which was in the lifetime of the confirmee.

At that point of time, every substantive act to be performed on the part of the government, to invest the confirmee with a perfect title to the specifically described four leagues of land mentioned in the grant to Solano, became fully complete; and all that remained to be done thereafter, were duties of a mere ministerial nature. (*Doe* v. *Eslava*, 9 How. 447, and cases therein cited; *Landes* v. *Brant*, 10 Id. 371—373; *Landes* v. *Perkins*, 12 Mo. 254; 14 Johns. 406.)

The *last substantial act* in the case at bar, and that which was necessary to give precision to the title, and attach it to a particular tract of land, and thus render that which before was imperfect, a perfect title, was the segregation and measurement by the proper Surveyor-General, of the quantity specified: The *first substantial act* towards the completion of the Suisun title was the filing of a petition before the Board of Land Commissioners, setting forth the claim of the petitioner, and praying its confirmation. By the authority of *Landes* v. *Brant*, the patent relates to the first substantial act in the series necessary to be taken in order to perfect the title, which, before then, was imperfect. So in the case at bar, the same reasonable rule would give the patent legal effect and validity by relation, from the filing of the claimant's petition with the Board of Commis-

sioners. (See also Act Congress, 1836, 5 Stat. at L. 31; Act entitled Estates of Deceased Persons, Secs. 194, 195; Wood's Dig. 410, 411; *Becket* v. *Selover,* 7 Cal. 238, 239.)

3d. The defendant is not in a position to object to the plaintiffs' right to the possession of the land in controversy, because of any title in himself as successor to Armijo; for Armijo never had absolute title to the land, and the defense made is concluded by the patent to Ritchie. (17 How. 558; Id. 413; 20 Id. 426; 18 Id. 25, 179; 9 Id. 356; 10 Johns. 23; 12 Id. 81; 3 Cow. 281.) His interest was only equitable. (12 Pet. 435, 436; 10 Id. 330, 335, 736; 4 Id. 512; 9 Id. 734.)

4th. The imperfect title of Armijo cannot be rendered perfect by any other means than those provided by, and enumerated in, the Act of Congress of 1851. (17 How. 403, 413; 18 Id. 409, 413; Id. 25; 19 Id. 80—82; 12 Id. 76—77; 17 Id. 565; 20 Id. 426; 18 Id. 412.)

Again: To the making of the confirmation, survey, and patent, conclusive against the defendant in this action, it is objected, on his part, that the 15th Section of the Act of March 3, 1851, provides that these shall be conclusive between the United States and the claimant only, and shall not affect the interests of third persons.

We believe, that, notwithstanding the general language of the 15th Section of the Act of 1851, its application should be limited to the interests of those third persons, whose rights of property and title in the particular land, were perfect and absolute at the time of the acquisition of California by the United States: Which interests would, by the law of nations, have been as effectually protected without the provision of said 15th Section, as by it; and that by the law of nations, the rights of property of private persons in California, held under the laws of Mexico, at the time of the treaty of Guadalupe Hidalgo, would have been protected as amply as by the treaty stipulation for that purpose; and also that the 15th Section of the Act of 1851, and the stipulation for the protection of rights of property contained in the treaty, were provisions incorporated, each in its appropriate place, *ex abundanti cautela,* in order that those whose rights of property were beyond the reach of confiscation, might enjoy exemption from the vexatious and harrassing litiga-

tion which would have resulted from the teachings of carping advocates of the omnipotence of government. (*U. S.* v. *Percheman,* 7 Pet. 87, 88; *U. S.* v. *Arredondo,* 6 Id. 741; *Strother* v. *Lucas,* 12 Id. 438, 439, and the cases therein cited; *Ferris* v. *Coover,* 10 Cal. 619; *Doe* v. *Eslava,* 9 How. 445, and cases cited; *Strother* v. *Lucas,* 12 Pet. 438, 439, and cases cited; Act of Congress, May 3d, 1831, 6th Section, as to *Surveyor of Public Land in La.*)

*Thompson, Irving & Pate,* for Respondent.

Upon the facts, the principal question involved in the case is, whether a patent from the United States, founded upon a confirmed Mexican grant, is paramount to, and can override, a prior Mexican grant for lands held, occupied, and claimed, by the first grantee, by specific boundaries, to the extent specified in the grant in conformity with its terms, and within the exterior limits therein described. The affirmative of this proposition is maintained by the Appellants; while, on the other hand, it is contended by the Respondent, that the prior grant accompanied by possession, with specific boundaries of the quantity of land granted, within the exterior limits described in the grant, conferred upon the grantee an absolute and indefeasible estate in the land so granted and occupied, which could not be divested by any subsequent grant by the Mexican Government, or the United States, who succeeded to the rights of that government, unless the title of the first grantee had been forfeited by due course of law, and such forfeiture duly declared by a tribunal of competent jurisdiction.

We do not pretend to controvert, as a general proposition, the doctrine set out in the first point of the argument contained in the brief of the Appellants, filed by Messrs. Thornton, Williams & Thornton, that the decisions of the Supreme Court of the United States are a rule of decision to the State Courts, on questions involving the interpretation of treaties and the construction of Acts of Congress. But we do deny that the authorities cited, from those decisions growing out of questions arising under the inchoate titles or concessions issued by the Spanish authorities in Louisiana, have any application to the case at bar.

It has been argued that the first patent appropriates the land

and extinguishes all claims of inferior dignity.    But this view is not sustainable.    The issuing of a patent is a ministerial act which must be performed according to law.    A patent is utterly void and inoperative which is issued for land that had been previously patented to another individual.    (*Choteau* v. *Eckhart*, 2 How. 344; *Les Bois* v. *Bramell*, 4 Id. 449; *Bissell* v. *Penrose*, 8 Id. 7; *Menard's Heirs* v. *Massey*, Id. 293; *Mills* v. *Stoddard*, Id. 345.) The cases of the *U. S.* v. *Boisdore*, (11 How. 69,) *Glenn* v. *U. S.* (13 Id. 250,) and *Villemont* v. *U. S.* (Id. 266,) cited in the case of Fremont, and others of a similar character, were all decided upon the same general principle, that there had been no severance of the land claimed from the public domain; and that the right of property still remained in the government.

The radical error on which the whole argument for the Appellants rests consists in the application of principles and rules of decisions, founded upon the laws of Spain and the United States in relation to the granting of the public domain, to grants of land made by the Mexican authorities in California, where the mode of granting and the rules for the segregation of the land granted from the public domain, were entirely different.

The difference between the two classes of cases is so clearly stated in the case of *Fremont* v. *The U. S.* that we need only refer the Court to the lucid exposition upon that point contained in the opinion of Chief Justice Taney, (17 How. 553—559.)

In support, therefore, of the general proposition laid down in the first part of the argument, as the basis of the Respondent's defense to the action, we shall endeavor to maintain the following points:

1st. That the grant to Armijo, of the 4th of March, 1840, vested in the grantee a present and immediate property in fee to the three leagues of land specified in the grant, within the exterior limits delineated on the map; and that his subsequent occupation and possession of the three leagues, in conformity with the terms of the grant and the provisions of the Mexican law, by metes and bounds, was a segregation of the land from the public domain, by reason of which the general gift became a particular gift, and the grant attached to the specific three leagues so held and occupied.

The first branch of this proposition can scarcely be considered

an open question.   See the decision of the Supreme Court of the United States, in the Fremont case, on this point, and the affirmance of the principle there laid down by this Court in the cases of *Gunn's Adm'r* v. *Bates*, (6 Cal. 263,) and in *Palmer* v. *Boling*, (8 Cal. 389) ; *Ferris* v. *Coover*, (10 Cal. 589.)

It is contended, however, on the part of the Appellants, that although the grant to Armijo might give him an immediate vested right to the three leagues of land within the exterior limits delineated on the map, yet that right could attach to no particular three leagues until there had been an official survey made by authority of the government, establishing the precise limits of the tract granted.   We have already had occasion to call the attention of the Court to the broad distinction laid down by Chief Justice Taney, between cases arising under Spanish grants and the land laws of the United States, in relation to the disposition of the public domain, and those growing out of Mexican grants in California.

But it is contended for the Appellants that because, under the provisions of those Acts, a survey was necessary to complete the title, that being the mode of segregation prescribed by the law, therefore the same mode of segregation was requisite, under the laws of Mexico, in order to perfect the title of a grantee from that government.

The authorities cited have no application.   Where the law requires a particular mode of segregation, that mode must be pursued before a severance can take place.   But we cannot perceive the application of this, or the numerous other cases to the same effect cited in the briefs of the Appellants, to the case presented by the record.   For that purpose it would be necessary first to show that the laws of Mexico in force in California, required a survey before the title could vest, and this they have utterly failed to do.

We hold the rule to be that where there is no locative description in the grant, and no possession or occupation under it, then, and then only, a survey or some equivalent act by authority of the government, was necessary to segregate the land and give precision to the grant.   On the other hand, where the grant contains sufficient words of description, to fix the *locus in quo*, and the grantee takes possession and occupies consistently with

the calls of the grant, such description and occupation operate, *per se,* as a severance of the land from the public domain, and vest in the grantee an absolute and definite title to the land so granted and occupied. (*Smith* v. *U. S.* 10 Pet. 326; *Lecompte* v. *U. S.* 11 How. 127, 128; *U. S.* v. *Clark,* 8 Pet. 466, 467; *U. S.* v. *Percheman,* 7 Id. 89—93; *U. S.* v. *Peralta,* 19 How. 345.)

As to the effect of actual occupation and possession under the grant, we say, that an actual entry by the grantee under his grant, prior to the change of government, and continued occupation in accordance with its terms and the requirements of the law, operated as a severance of the land granted from the public domain, and gave full effect to the title.     This proposition is fully sustained by the decisions of the Supreme Court of the United States and the Courts of Louisiana, in relation to Spanish concessions, and is likewise in strict conformity with the laws, usages, and customs, of the Mexican Government in force in California, when the grants to Armijo and Solano were made. (*U. S.* v. *Boisdore, et al.* 11 How. 63, 69; Id. 115; *Lafayette* v. *Blanc,* 3 Ann. La. 60; *Hooter* v. *Tippet,* 17 La. 109.)

The doctrine here laid down, evidently contemplates three modes by which the land granted could be severed from the public domain.

1st. Where the descriptions in the grant were sufficient to identify the particular tract granted.

2d. Where the party entered under the grant and occupied the land, in conformity with its terms; and,

3d. By an official survey, when the description in the grant was vague and indefinite, and there had been no possession under it.   As to the first and last mentioned modes of segregation, there would, we presume, be no conflict of opinion between the opposing counsel and ourselves, the second results necessarily from the doctrine laid down in the above cases.

Upon this branch of the subject, therefore, we contend in the second place—

That, under the laws, usages, and customs, in force in California, in reference to the granting of the public domain, and by the terms of the instrument itself, a grant of lands, such as we are considering, gave to the grantee the right to locate and occupy the quantity of land granted within the exterior limits de-

scribed in the grant, and that such location and occupation, when made in accordance with the calls of the grant, and in conformity to law, was conclusive both on the grantee and the government.

The error of the argument of the Appellant's counsel, on this point, consists in giving to the act of juridical possession the force and effect of a survey, as understood under the laws of Spain and the United States; than this, nothing can be more fallacious.

The approval of a grant by the Departmental Assembly, was a prerequisite to obtaining juridical possession. (See Espediente in cases of Vaca and Peña, and the Archives in Surveyor-General's office; *U. S.* v. *Reading,* 18 How. 7; 10 Cal. 618.)

If, then, the juridical possession could not be given until after the approval, and the failure to obtain the latter did not affect the grantee's right and title to the land, as decided in the Reading case, neither would it be at all impaired by his failure to obtain the former. It had resulted from no default of his; he had done all that was incumbent upon him to perfect his title. He had entered upon the land, built a house, which was inhabited by his family, in compliance with the imperative condition of his grant; he had stocked it with cattle, and inclosed and cultivated portions of it. Here his duty ended; and until the Governor obtained from the Assembly the approval of the grant, no juridical possession could be had. The failure, therefore, to obtain the juridical possession, where the grant had not been approved, could no more affect the title than the want of the latter formality. It results, then, from this view of the subject, that unless the possession and occupation of the grantee, in conformity with the terms of his grant, operated a segregation and perfected his title, there could be no severance of the land from the public domain in such cases, which embrace the majority of Mexican grants in California, and the title still remained in the government, a position which is well characterized by the learned Judge above cited, as startling.

As to the effect, under Mexican law, of prior occupation and possession, see cases as to the grant of Richard Berry; *The Heirs of Wm. Fisher* v. *U. S.* (No. 244, Docket late Land Commission); Espediente and Decree in case of Vaca above, to be found in the Archives.

2d. That the patent from the United States to Archibald A. Ritchie, of the 17th January, 1857, operated only as a quitclaim or relinquishment of title on the part of the government, and did not affect the rights of third parties; and that, so far as it conflicts with the vested rights of Armijo, and those claiming under him, by virtue of his grant of the 4th of March, 1840, the same is void and of no effect. (See Act of Congress, 3d March, 1851, for settlement of Land Claims in California, Sec. 15, 9 U. S. Statute, 631; Debate in U. S. Senate on the same, Cong. Globe, Second Session, 31st Congress, Vol. 18, pp. 428, 429; Act of 3d March, 1831, to create office of Surveyor-General for State of Louisiana, Sec. 6, 4th Stat. 494; *Marsh* v. *Brooks et als.* 8 How. 223; *Barry* v. *Gamble,* 8 Mis. 87; *De la Houssaye* v. *Saunders,* 4 Lou. 445; *Broussard* v. *Gonsoulin,* 12 Rob. Lou. 1—8; *Jewell* v. *Porche,* 2 Lou. 146; *Polk's Lessee* v. *Wendell,* 9 Cranch, 99; 5 Wheat. 293; *Stoddard* v. *Chambers,* 2 How. 284; *Choteau* v. *Eckhart,* Id. 375; *Les Bois* v. *Bramell,* 4 Id. 449; *Bryant* v. *Forsyth,* 19 Id. 334; *Bissell* v. *Penrose,* Id. 317.)

There seems to be an idea pervading the argument of the opposite counsel, though not distinctly avowed, that a peculiar efficacy attaches to a patent from the United States which does not belong to other conveyances. They say : " That nothing but a patent will pass a consummate title, unless in case of a grant in fee by Act of Congress, or a grant of a specific parcel of land." Now, this might all be true under the rules prescribed by law, for the granting and conveying of lands in the United States, but a very different system may have obtained in Mexico; and if a party could show that, according to the Mexican law, he had obtained a perfect title to lands, although it was by neither of the modes enumerated above, yet we apprehend that under the provisions of the treaty of cession, the United States and the tribunals of the country would be bound to respect it to the same extent as if he had obtained a patent from the United States. In our view, a patent from the United States is entitled to no more dignity or consideration, in a legal point of view, than any other instrument for the conveyance of real estate; and its effect must be tested, and its language construed by the same rules which apply to other deeds. This is clearly illustrated in many of the cases cited above. (*Stoddard* v. *Chambers, Bissell* v. *Pen-*

rose, *Marsh* v. *Brooks*, *Choteau* v. *Eckhart*; 6 Cal. 263; 8 Id. 384; 10 Id. 589.)

4th. Where adjoining landholders agree upon a dividing line between their respective tracts, such an agreement is conclusive between the parties and their privies; and the admissions of the party making such agreements, made while owner of the premises, long continued occupation up to the agreed line, and long acquiescence by the parties in such line, are evidence from which such an agreement may be presumed. (*Thacker* v. *Gardner*, 7 Met. 484; *Wray* v. *Berry*, 9 N. Hamp. 473; *Houston* v. *Matthews*, 1 Yerg. 116; *Wilson* v. *Hudson*, 8 Id. 398; *Dibble* v. *Rogers*, 13 Wend. 467; *Adams* v. *Rockwell*, 16 Id. 285; *McCormick* v. *Barnum*, 10 Id. 105.

[In this connection counsel discussed the effect of the award.]

Again : The patent to Ritchie is void, because issued after his death. (Act Cong. 5 U. S. Stat. 31.)

FIELD, J. delivered the opinion of the Court—TERRY, C. J. and BALDWIN, J. concurring.

This is an action of ejectment, for the recovery of a tract of land situated in the valley of Suisun, in the county of Solano. Both parties claim title under grants of the Mexican Governor of California, Juan B. Alvarado — the plaintiff under a grant issued to the Indian Chief, Francisco Solano, on the twenty-first of January, 1842, and the defendant under a grant issued to José Francisco Armijo, on the fourth of March, 1840. The grant to Solano is of land known by the name of Suisun, and covers four square leagues, within exterior limits embracing about eight leagues. The grant to Armijo is of land known as Tolenas, and covers three leagues, within limits embracing from twelve to twenty leagues. The maps referred to in both grants cover the land in controversy. The grant to Solano was presented to the Board of Land Commissioners for confirmation by Archibald A. Ritchie, who had become, by purchase, interested in the land granted; and the same was confirmed to him by the Board in January, 1853, and subsequently by the United States District Court, in November, 1853, and the decree of confirmation was affirmed on appeal by the Supreme Court of the United States, at its December Term, 1854. In July of the following

year (1855) the four leagues specified in the grant were laid off and surveyed, under the directions of the Surveyor-General of the United States for California, and the survey was approved and authenticated by that officer. In conformity with this survey, a patent on behalf of the United States was issued to Ritchie, bearing date on the seventeenth of January, 1857, for four leagues of land, with the specific description of the official survey. This patent covers the land in suit. The grant to Armijo was likewise presented to the Board of Land Commissioners, and was rejected. On appeal to the District Court of the United States, the decision of the Board was reversed, and the claim under the grant confirmed. From the decision of the District Court the case is now pending, on appeal, in the Supreme Court of the United States.

Both grantees resided within the limits of their respective grants, and it is insisted by the counsel of the defendant that the evidence establishes the fact that Armijo occupied and claimed three leagues of his tract, marked by metes and bounds, and that such occupation and claim operated as a segregation of that specific quantity, and the grantee's right thereto could not be impaired by the subsequent grant to Solano, and the patent thereon to Ritchie.

We shall pass over any consideration of the question as to the application of the doctrine of relation, in virtue of which the plaintiffs contend that the grant to Solano, though subsequent in date to that to Armijo, relates back to the provisional decree of Vallejo, made in January, 1837, as immaterial to the determination of the case. We shall assume, also, for the purposes of the appeal, that Armijo occupied and claimed from the entire quantity comprehended within the map referred to in his grant, three specific leagues, and that these covered the land for the recovery of which the present suit is brought. We propose to place our decision upon grounds which will settle the controversy in the present case, and serve as a rule in controversies of a similar character; and for that purpose we shall disregard the minor points presented by the record, and confine ourselves principally to the questions which properly and necessarily arise from the claim asserted by the defendant, that the occupation and possession by Armijo, under his grant of three leagues, by designa-

ted metes and bounds, was a location of that specific quantity within the exterior limits described in the grant, effectuating its segregation from the public domain, and attaching thereto the grant, and making the title of the grantee perfect against even a subsequent patent of the United States.   These questions relate to the nature of the titles conferred by the grants; to the authority by which location can be given to the specific quantity granted where that is less than the quantity contained within the exterior limits of the grants; to the effect of a patent of the United States in such cases, and who constitute the third persons mentioned in the 15th Section of the Act of Congress of March 3d, 1851, against whom the confirmation and patent are not conclusive.

The grants to Solano and Armijo both purport to convey the land designated therein—limiting its extent in the first case to four, in the other to three, leagues.   Both are subject to similar conditions, with the exception of one peculiar to the grant to Armijo, against the molestation of the Indians there located and his immediate neighbors.   Both provide for the free and exclusive enjoyment of the land by the grantees, and for such use and cultivation of it as they may think proper.   Both require juridical possession to be given by a public officer of the vicinity, by whom the boundaries are to be designated.   Both reserve any surplus over the quantity specified to the uses of the nation. Both are made liable to denouncement for failure to comply with their conditions, and both are subject to the approval of the Departmental Assembly.   The grant to Solano received such approval—the one to Armijo did not; but this fact does not impair the title which passed to the latter.   The effect of the approval was only to discharge the grant to Solano from liability to defeasance by the Mexican Government, except for breach of its conditions subsequent.   Both of the grantees acquired rights of property, which were not impaired at the date of the treaty of Guadalupe Hidalgo, and were protected by the guaranties of that instrument, and there is no law which authorized a forfeiture for any act or omission since.   (Opinion of U. S. Supreme Court in the Sutter Case.)

The grants in question are similar in the title they convey to the one issued to Sutter, which was the subject of consideration in

27

the case of *Ferris* v. *Coover*, (10 Cal. 589,) and, like that, passed an estate in the land embraced within their exterior boundaries, to the extent of the specified quantity, to be subsequently laid off by the government. They were issued in pursuance of the laws and regulations of Mexico for the colonization of the territories, the object of which was the settlement of the vacant lands of the Republic; and for that purpose were made subject to the usual condition in such cases, of cultivation and occupancy. The first condition in the grant to Solano provides for his inclosure of the land with a reservation of the crossings, roads, and servitudes, and for his free and exclusive enjoyment of the same, with such use and cultivation as he may think proper, and requires the construction of a house and its inhabitation within one year. Its language is:

"That he may inclose it without prejudice to the crossings, roads, and servitudes, and enjoy it freely and exclusively; making such use and cultivation of it as he may see fit, but within one year he shall build a house, and it shall be inhabited." The second condition in the grant to Armijo is substantially the same; so were the second condition in the grant to Alvarado, (*Fremont v. United States*, 17 How. 545); the third condition in the grant to Reading, (*Reading* v. *United States*, 18 How. 2); and the first condition in the grant to Jimeno, (*United States* v. *Larkin*, 18 How. 559). Indeed, the same condition, substantially, was contained in all the colonization grants issued to individuals by the Mexican Government of California. Whilst it required the construction of a house, it conferred a right of entry upon the land, without which the requirement would have been incapable of fulfillment. Whilst it enforced the inhabitation of the house when constructed, it gave a right to the possession, use, and enjoyment, of the land, without which the inhabitation would have been of little benefit to the grantee, and the policy of the government in the settlement of the country would have been entirely frustrated.

But though the grants passed a right of possession to the land, they conferred only a vested interest in the specific quantity designated, to be afterwards measured and laid off by the officers of the government. The conditions required a juridical posses sion to be given by the magistrate of the vicinage, who was to

cause a survey of the specific quantity granted, to be made in accordance with the provisions of the law, the surplus being reserved for the use of the nation. The juridical possession was to accompany the official survey, and in this way alone could a segregation of the given quantity take place under the Mexican authorities, from the public domain. The officers by whom, and the manner in which, the measurement was to be made, were distinctly designated by the law. The grantee could not, for himself, make the segregation. "No person," said the Mexican law, " though his grant be older than others, can take possession for himself, or measure, or set limits, to his landed property, (*propriedas territoriales,*) unless it be done by judicial authority, with the citation of all those who bound upon him, (*colindantes,*) for whatever is done contrary to this will be null, of no validity or effect." (*Ordenanzas de Tierras and Aguas by Galvan,* edition of 1855. As the grantee could not locate his land by his own survey, it would seem a necessary conclusion that he could not do so by mere occupation, and the assertion of a claim to any particular place.

The right to make the measurement and to give the juridical possession remained with the government, and could only be exercised by its officers. That right, like all other public rights, passed, with the transfer of the territory, to the government of the United States, and is now to be exercised in accordance with its laws. The estate, which vested in the grantees upon the execution of the grants, remains unaffected by the change of government; but the survey and measurement are to be made—not in accordance with the laws of the old government, which were abrogated with its authority, but in accordance with the policy and laws of the new government. The right to survey and segregate the specific number of leagues granted to Solano and Armijo, respectively, under the legislation of Congress, belongs to the Executive Department, and cannot be exercised by the Courts of Justice. The Courts can ascertain and fix the position of boundaries which are designated, but they cannot give boundaries to a specific quantity which has none and lies in a larger tract. To give precision and location to such specific quantity a survey by the department is essential. The authorities to this effect are numerous and decisive. In *Stanford* v. *Taylor*, (18

How. 409,) the plaintiff claimed title to the land in dispute under a Spanish concession of 1785, which was confirmed in 1811, and a survey ordered conformably to the possession.  The concession described the land as lying along the River Des Peres, from the north to the south, and as bounded on one side by the lands of Louis Robert, and on the other by the domain of the King.  The survey was not executed until 1834, when the Surveyor ordered the land to be located *west* of Robert's tract.  The plaintiff insisted that the land granted and confirmed adjoined Robert's tract on the east, and that the location was so plainly apparent on the face of the concession as not to require a survey, and offered evidence to show that the possession of the confirmee was part of a tract of land east of Robert's tract and adjoining it, and, if located there, would include the premises in controversy.  The Court rejected the evidence, and allowed the defendant to introduce the official survey, and excluded evidence offered by the plaintiff to show that this was improperly made west of Robert's tract instead of east of it, and instructed the jury that, as the parties agreed that the official survey of the confirmation under which the plaintiff claimed did not include the premises in suit, they ought to find for the defendant.  In considering the exceptions taken to the ruling and instructions, Catron, J. in delivering the opinion of the Court, said : "The law is settled, that where there is a specific tract of land confirmed according to ascertained boundaries, the confirmee takes a title on which he may sue in ejectment.  The case of *Bissell* v. *Penrose*, (8 How. 317,) lays down the true rule.

"But where the claim has no certain limits, and the judgment of confirmation carries along with it the condition that the land shall be surveyed and severed from the public domain and the lands of others, then it is not open to controversy that the title attaches to no land ; nor has a Court of Justice any authority in law to ascertain and establish its boundaries, this being reserved to the Executive Department.  The case of *West* v. *Cochran*, (17 How. 403,) need only be referred to as settling this point. And the question here is, whether the concession to Perry (the confirmee) is indefinite and vague, and subject to be located at different places."  And, after considering the description, the Court concluded that the uncertainty of the outboundary was

too manifest to require discussion to show that a public survey was necessary to attach the concession to any land.

In *Ledoux* v. *Black*, (18 How. 475,) the Court, in speaking of the Act of Congress of 1820, confirming the plaintiff's claim, held that the Act did not tend to locate the claim and sever the land from the public domain, and that that could only be done by a *public survey*.

In *Willot* v. *Sanford*, (19 How. 81,) the defendants derived title under one Disonet, whose claim was confirmed by Act of Congress, in 1816. The land was surveyed in 1817, by authority of the United States, and a patent was issued in 1850. There was a conflict between this survey and the survey of the claim upon which the plaintiff relied. The Circuit Court instructed the jury that the survey and patent under which the defendant claimed were not conclusive evidence that the land they embraced was correctly located and surveyed according to the confirmation; and if they believed that the land sued for was not within the confirmation of the legal representatives of Disonet, although it might be within the survey and patent, then the survey and patent would not protect the defendants; but the Supreme Court held that Courts of Justice had no authority to disregard surveys and patents when dealing with them in actions of ejectment, and reversed the judgment of the Court below. (See, also, *Bissell* v. *Penrose*, 8 How. 317; *West* v. *Cochran*, 17 Id. 413; *Cooper* v. *Roberts*, 18 Id. 173; *Bryan* v. *Forsyth*, 19 Id. 334; *Balance* v. *Papin*, 19 Id. 343.)

The matter of surveys of floating grants belongs, then, to the Executive Department of government, under the legislation of Congress on the subject of the public lands. With such surveys the Courts of Justice have nothing to do. Whether in justice to the claimants the location should have been different from the official survey is none of their concern. That belongs to a department of government whose action is not subject to review by the Judiciary. The Courts, it is true, must determine whether prior rights of third parties have been interfered with by such survey and the patent following thereon, but they cannot correct the survey or patent and locate the land where, in their opinion, it ought originally to have been made.

The case of *Fremont* v. *The United States*, (17 How. 542,) is in

point, as to the estate which passed under the grants to Solano and Armijo, and the authority by which precision and location are to be given to the specific quantity granted. In that case, the grant to Alvarado was for ten leagues, within a tract of much greater extent, and the Court held that as between the government and the grantee, the latter had a vested interest in the quantity of land mentioned in the grant. "The right to so much land," said the Chief Justice, in delivering the opinion, "to be afterwards laid off, by official authority, in the territory described, passed from the government to him by the execution of the instrument granting it." And in illustration of the principle asserted, the Court cited the case of *Rutherford* v. *Greene's ·* *Heirs,* reported in 2 Wheat. 196, which arose upon an Act of the State of North Carolina, of 1782, providing that twenty-five thousand acres of land should be allotted to General Greene and his heirs, within a tract reserved for the use of the army, to be laid off by Commissioners appointed therefor. The Commissioners, in pursuance of the Act, allotted the twenty-five thousand acres, and caused the tract to be surveyed and returned to the proper office, and the question upon which the case turned, related to the validity of the title of General Greene and the date at which it commenced. The Court held the general gift of twenty-five thousand acres, lying in the territory reserved, became, by the survey, a particular gift of that quantity within the survey, and concluded a full examination of the title by saying that it was the clear and unanimous opinion of the Court, "that the Act of 1782 vested a title in General Greene to twenty-five thousand acres of land, to be laid off within the boundaries allotted to the officers and soldiers, and that the survey made in pursuance of that Act, and returned March 3, 1783, *gave precision to that title, and attached it to the land surveyed.*"

The Court, in the Fremont case, observes, in reference to this case of *Rutherford* v. *Greene's Heirs,* that "it recognizes as a general principle of justice and municipal law, that such a grant, for a certain quantity of land by the government, to be afterwards surveyed and laid off within a certain territory, vests in the grantee a present and immediate interest. In the language of the Court, the general gift becomes a particular gift, when the

survey is made; and when this doctrine has been asserted in this Court, upon the general principles which Courts of Justice apply to such grants from the public to an individual, good faith requires that the same doctrine should be applied to grants made by the Mexican Government, where a controversy arises between the United States and the Mexican grantee." And, as to the authority by which the survey was to be made, the Court holds this language: "Under the Mexican Government, the survey was to be made or approved by the officer of the government, and the party was not at liberty to give what form he pleased to the grant. This precaution was necessary, in order to prevent the party from giving it such a form as would be inconvenient to the adjoining public domain, and impair its value. *The right which the Mexican Government reserved to control this survey passed, with all other public rights, to the United States,* and the survey must now be made under the authority of the United States, and in the form and divisions prescribed by law for surveys in California, embracing the entire grant in one tract."

The authorities cited are conclusive of the questions we have been considering. Following them, we must hold that the grants to Solano and Armijo, passed a present and immediate interest in the quantity of land specifically designated in their respective grants, to be afterwards surveyed and laid off within the exterior limits of the general tracts by the government; that such survey could only be made under the former government, by its officers, and could not be made by the grantees themselves; that the right of survey passed, with other public rights, to the government of the United States, and is to be exercised in pursuance of its policy, and in conformity with its laws; that by its legislation, the subject of surveys is intrusted to the Executive Department; that the location of confirmed grants, when the quantity granted is without specific boundaries, lying within a larger tract, rests exclusively with such department, and cannot be reviewed or corrected by the Judiciary, but is binding and conclusive upon it in actions of ejectment, except only, when the patent issued thereon conflicts with prior rights of third parties, and then its inconclusiveness is maintained only so far as may be necessary for the protection of such prior rights.

The learned counsel for the defendant has presented with great force the injustice which may follow from holding that the government can compel a grantee to abandon that part of the tract embraced in the exterior limits of his grant, upon which he has settled and made his improvements, and to take some other part; but his observations should be addressed to the officers of government, under whose supervision and control the survey and location are placed. To their sense of justice the appeal is to be made, and with them the observations would be entitled to the highest consideration. The Courts of the country possess no authority to act upon them. The right to measure and set apart the specific quantity was not left to the grantee, as we have observed, under the Mexican Government, nor is it permitted under our own. Occupation and cultivation could have no greater effect than a private survey. They were without binding effect upon the former government, and are equally inoperative under the new. In *Smith* v. *The United States*, (10 Peters, 335,) the Court said: "The laws of the United States give no authority to an individual to survey his grant or claim to lands; he may mark lines to designate the extent and bounds of his claim, but he can acquire no rights thereby. The only effect which we can give to this private survey is to consider it as a selection by the petitioner of that piece of land, as a part of what he was entitled to locate, in virtue of his general grant."

In *United States* v. *Hanson*, (16 Peters, 199,) a private survey was considered and rejected, as being of no force or validity. In *United States* v. *King*, (3 How. 785,) the Court rejected a survey made by the officer of the government after his authority had ceased. In *Les Bois* v. *Bramell*, (4 How. 457,) in speaking of a survey of one Mackay, the Court said it "was a private one, made at the instance of the inhabitants of St. Louis, and was not binding on the rights of any one;" and in *Mackay* v. *Dillon*, (4 How. 447,) of the same survey: "It was in its nature a private survey, not binding on the United States." In *Glenn* v. *The United States*, (13 How. 256,) in referring to surveys offered in evidence, the Court said: "The surveys produced to us are private ones, and of no value in support of the claim."

The location of the specific quantity may be made by a survey of such quantity, or by grants with specific boundaries of such

parts of the general tract as will reduce it to such specific quantity. Either course will operate to give precision to the claim of the grantee. So long as there remains within the general tract sufficient land to satisfy the quantity specified in his grant, the grantee is without remedy. To this effect is the language of Mr. Chief Justice Taney, in the Fremont case. "It is true," he says, "that if any other person within the limits where the quantity granted to Alvarado was to be located, had afterwards obtained a grant from the government, by specific boundaries, before Alvarado had made his survey, the title of the latter grantee could not be impaired by any subsequent survey of Alvarado. As between the individual claimants from the government, the title of the party who had obtained a grant for the specific land, would be the superior and better one; for by the general grant to Alvarado, the government did not bind itself to make no other grant within the territory described, until after he had made his survey." (17 How. 558.)

To the same effect is the language of the Supreme Court of Louisiana, in *Lott* v. *Prudhomme,* (3 Rob. 293,) cited in the opinion rendered in *Ledoux* v. *Black,* by the Supreme Court of the United States. "We then held," referring to the previous adjudication, "that when the boundaries of a confirmed claim are vague and uncertain, and are to be fixed by the operations of the surveying department, or such confirmation is only the recognition of a pre-existing right or claim, and before the survey and location the government sells a part of the land *not necessarily embraced within the tract confirmed,* the title of the purchaser will prevail."

This view disposes of the questions raised upon the award between Vallejo, the vendor of Ritchie, and Armijo, made in August, 1847. We are of opinion that the correct construction of the award makes the ridge and not the stream the dividing line between the two claims; but if we admit, for the purposes of the argument, that Suisun Creek was intended by the parties, it is difficult to perceive how this fact can avail the defense. Until the action of the government, whilst the claimants rested only on their grants, the award would have been conclusive in any controversies between them. But the government having wisely, or otherwise, issued a patent to Ritchie of a portion of the land

included in the general tract designated in the grant to Armijo, (assuming this to be the fact—and we do so only for the argument,) it does not lie in the mouth of the latter to complain, there still remaining of such general tract more than sufficient to satisfy the specific quantity granted to him. The award could not bind the government, or control the effect of its patent. It was at most only effective as to the lines of the exterior limits of the general tracts claimed by the grantees. If the patentee accepted the land described in his patent as answering his claim, it is not perceived how any other persons can complain, even if a portion of the land thus taken was without the boundaries of his original claim.

The limitation of quantity was a controlling condition of the grants in question, and the delivery of juridical possession was an essential ceremony, under the government of Mexico, to perfect the title of the grantees to the specific quantity designated. This was expressly held in the case of *The United States* v. *Fossat*, (20 How. 426.) Until such possession, which was accompanied by a survey, the title of the parties attached to no definite portion of the tract. There is no evidence in the record that such juridical possession was given under the former government to either Solano or Armijo, although in the opinion of the Supreme Court of the United States, in the *Ritchie Case*, (17 How. 537,) it is said that the grantee, Solano, was put in juridical possession in conformity with the conditions of his grant. If this were the fact, it does not appear in the transcript before us, and the rights of the parties are treated as though no such fact existed. The right, then, which the Mexican Government reserved to itself to control the location, having passed to the government of the United States, the duty to exercise such right devolved upon the latter. This duty was discharged by the survey following the final confirmation, and from that time the title of the parties claiming under Solano became perfect. On the other hand, the title under the grant to Armijo, did not attach to any three specific leagues; it constituted only an interest in such quantity, to be afterwards laid off by competent authority. Such general interest—not attached to the land in controversy, but, by the action of the officers of government, excluded from it—cannot be set up as a defense to the claim of

Waterman *v.* Smith.

the plaintiffs. The patent is conclusive evidence of the right of the patentee to the land described therein—not only as between himself and the United States, but as between himself and a third person, who has not a superior title from a source of paramount proprietorship. The patent was not necessary to invest Ritchie with the title, as his title existed at the cession of the territory, and the only act to render it perfect to a defined and particular tract, was an official segregation. The title was recognized by the decree of final confirmation, and the approved survey attached it to the specific land. The essential and substantive acts under the law of 1851, were the confirmation and survey. The patent in such cases is only evidence of the preexisting title made perfect by these acts. Upon the original grant, final confirmation, and approved survey, the plaintiffs might have relied, without reference to the patent. The survey following the final confirmation was made and approved in July, 1855; Ritchie died in July, 1856, and the patent bears date in January, 1857. At the date of the survey every substantive act required for the vesting of a perfect title had been performed. The subsequent issuance of the patent only involved duties of a mere ministerial character, and by a just application of the doctrine of relation, the patent must be regarded as if it had received the signature of the President at the completion of the segregation of the four leagues. In *Landes* v. *Brant*, (10 How. 370,) the Supreme Court of the United States held that a confirmation made in 1811, and a patent issued in 1845, related to the first act necessary to complete the title, that of filing the claim in 1805, and that intermediate conveyances made by the confirmee, or by the Sheriff in his behalf, of a day after the first substantial act, were covered by the legal title, and passed that title to the alienee. In that case Clamorgan, the patentee, had died in 1814, and the Court held that according to the common law the patent was void for want of a grantee, but that this defect was obviated by the Act of Congress of May 20, 1836, declaring: "That in all cases where patents for public lands have been, or may hereafter be issued, in pursuance of any law of the United States, to a person who had died, or who shall hereafter die, before the date of such patent, the title to the land designated therein shall inure to, and become vested in, the

Waterman *v.* Smith.

heirs, devisees, or assigns, of such deceased patentee, as if the patent had issued to the deceased person during life." This law, the defendants contend, does not aid the patent to Ritchie, as the patent is not for public lands. It may be true that the land embraced in the patent is not in the strict meaning of the term public, but we think it was the intention of the Act to cover all cases where any rights belonging to the United States existed in lands which could be relinquished by patent, even though an interest in the same was also held by the patentee himself. The United States possessed the right to make the location of the four leagues in any part of the general tract they thought proper. By their act the identical land patented might have been reserved as a part of the public domain—and there was, therefore, such a public interest possessed in the land as to include the latter within the spirit of the Act of Congress in question. We think the objection untenable, and that whatever rights could have passed to Ritchie by the patent, had he been living at the date of its issuance, inured to, and became vested in, his heirs or assigns, represented by the plaintiffs in this action.

The third persons against whose interests by the 15th Section of the Act of 1851, the final confirmation and patent are not conclusive, are those whose title is at the time such as to enable them to resist successfully, any action of the government in respect to it. Parties holding claims which may be located without the boundaries of the patent, and still within the limits of the general tract designated in the grants to them, do not constitute such third persons, nor do parties who hold claims only upon the bounty of the government, nor do intruders, nor even settlers, having certificates of sale, unless the same ante-date the presentation of the claim of the patentee to the Board of Land Commissioners for California, to which period the patent takes effect by relation. The interests of the third persons, intended by the Act, would have been as effectually protected without its provisions, as they are now by them. The section in question is only a legislative recognition of a principle of law and justice, applicable to all grants.

From the conclusions to which we have arrived, after the most mature consideration, it is clear that the plaintiffs were entitled to recover upon the facts conceded by the record, and

that the first, third, sixth, seventh, eighth and ninth, instructions, requested by the plaintiffs, were proper, and should have been given, and the Court below erred in refusing them. The instructions requested and refused, are as follows: 1. That, if the jury believe, from the evidence, that the Suisun and Tolenas grants embrace, within their exterior boundaries, a much larger quantity of land than called for by both said grants, and that neither of said grants was located or segregated under the Mexican Government, and that the Suisun grant has, under the United States Government, been finally surveyed, and located, and patented; but that the Tolenas grant has not been finally confirmed and located by an officer, or under the authority of the United States; that, in such case, the location and patent of the Suisun Rancho, made and granted by the United States, must prevail in this action, and a verdict should be rendered in accordance with this instruction.

3. "The location of land granted by the Mexican nation, in pursuance of the colonization law of Mexico of 1824, and the regulations of 1828, belonged to, and was to be made by, such government; and whenever such location was not made under the Mexican Government, the right to make it passed to the United States, under the treaty of Guadalupe Hidalgo."

6. "That in an action of ejectment by the person or persons entitled under a patent of the United States, against one in possession of any portion of such land, adverse to such patent, and the title whereon the same is predicated, and claiming to hold under a Mexican grant *which was not surveyed or located by metes and bounds, or juridical possession under the Mexican Government*, the defendant so claiming to hold adversely, as above mentioned, cannot interpose such unlocated grant, as a title paramount for the land described in said patent."

7. "That the patent in evidence by plaintiffs is conclusive as against the defendant, unless there is evidence that the defendant has a title superior to the title by said patent to the land in controversy, under a confirmed Spanish or Mexican grant, located under the Mexican Government, or under the United States Government."

8. "That if the jury believe, from the evidence, that the Suisun grant and Tolenas grant lie contiguous to and adjoining

each other, and that there is embraced within the *deseño* of the Tolenas grant and the land therein described, a, quantity of land outside of the land described in the patent of the United States to Archibald A Ritchie, *greatly exceeding three leagues of land;* that, in such case, the said Tolenas grant cannot be interposed and set up as a defense by defendant, without evidence of a specific location of three leagues granted to Armijo, by authority of the government of Mexico or of the United States; and showing that such last mentioned location embraces the land in controversy."

9. "The grant to Armijo does not invest him, or those claiming under him, with a title to any specific three leagues of land. If it is a grant of three leagues within a much larger area, then it is, in legal effect, a grant of land uncertain in its location, to be afterwards surveyed off to him by the government; and *until* such a survey on the part of the government, designating the three leagues of land granted to Armijo, he, or those claiming under him, have no right or interest *which can be alleged in resistance to the right vested in Ritchie, or those claiming under him, by the patent to Ritchie,* and this is true, although the land in controversy in this action is embraced within the exterior limits of the larger area, within which the three leagues granted to Armijo are to be located."

It is unnecessary to consider any other of the instructions given or refused, or points made by the Appellants. The judgment must be reversed, and the cause remanded for a new trial.

Ordered accordingly.